**Karen M. McNABB, Relator,**

v.

**CUB FOODS, Respondent.**

**No. CX–83–957.**

Supreme Court of Minnesota.

June 29, 1984.

Bruce C. Douglas, Edina, for relator.

Emery W. Bartle, Barbara A. Frey, Minneapolis, Hubert H. Humphrey, III, Atty. Gen., Laura Mattson, Asst. Atty. Gen., St. Paul, for respondent.

TODD, Justice.

Karen McNabb was employed as a meat wrapper by Cub Foods. She was subjected to sexual harassment which caused her to quit her job. She filed for unemployment compensation and her claim was denied on the grounds that she had failed to notify the employer of the sexual harassment prior to the day she quit her job. The appeal tribunal allowed the claim on the grounds that she had quit with good cause attributable to the employer. On appeal the commissioner reversed the appeal tribunal and denied unemployment compensation on the ground that Cub Foods did not know or should not have known that McNabb was being sexually harassed. We reverse.

McNabb was employed by Cub Foods on July 21, 1982 as a part-time delicatessen worker in its Brooklyn Park store. She was 36 years old at that time. In September of 1982 she became a wrapper in the meat department of the Brooklyn Park store. She became a union member and was paid a wage of $9.32 per hour, the highest wage she had ever earned.

Two incidents occurred at the Brooklyn Park store which led to harassment of McNabb. On one occasion she punched out for an evening work break. A male meat cutter went on break at the same time, apparently without punching out. When asked by the store meat manager, McNabb confirmed that the male employee was on break at the same time. He was fired. On another occasion McNabb was forced to wait on customers instead of doing her job because other meat cutter employees left the meat department unattended. In lieu of a break, McNabb punched out one-half hour early. When questioned why she punched out early, she stated all the meat cutters were on break and there was nobody to staff the meat department anyway. As a result of this, one of the meat cutters was demoted.

After these incidents the male meat cutters began to torment and harass McNabb. Her co-employees mixed up her meat trays, which made her job more difficult, and put chicken fat in her coat pockets. She was subjected to sexual harassment, both verbally and physically. She complained to her superiors about the tormenting and some of the harassment, but did not specifically complain about acts of sexual harassment.

In January 1983, Cub Foods transferred McNabb to its Fridley store where she continued work as a meat wrapper. Within a short time the tormenting and harassment, including sexual harassment, began again. On February 5, 1983, McNabb received a corrective action notice regarding improper weighing of meat packages. She objected to the notice. During the conversation, her immediate supervisor acknowledged that he knew what was going on in the meat department. He stated that he knew she had been hit and harassed. She then called Cub Foods' meat director to complain about the corrective notice given to her by her immediate supervisor. The meat director has supervisory and managerial authority over the meat departments of several Cub Foods stores and visits each store two or three times each week. In her conversation with the meat director, McNabb did not advise him of the harassment and torment to which she was being subjected.

McNabb complained to the union steward about the harassment, including the sexual harassment. He advised her to not say anything, as it would just make it harder for her to work there. Shortly thereafter, the harassment became so bad that she couldn't take it. On one occasion, after she finished work, she changed clothes, went into the cooler and cried. The night meat

manager came in and spoke with her. She told him that a co-employee, a meat cutter, had been touching and harassing her and she could not tolerate it any more. The meat manager told her she would get an apology from the cutter. No apology resulted and the harassment, including sexual harassment, continued unabated.

On March 7, 1983, McNabb asked to meet with the meat department manager in his office. She identified the meat cutter who she felt was the instigator of the harassment and he was called into the office. McNabb then stated: "You have calléd me a fucking bitch." The meat cutter responded: "No, I didn't, I called you a fucking cunt." The manager did not respond, but merely looked at the ceiling and gave no admonishment to the meat cutter. McNabb felt very degraded at this point and stated, "Well, there's nothing else for me to do but quit." The meat cutter began to chuckle at this point. McNabb put on her coat and left and the meat manager made no comment.

The meat manager promptly notified the meat director of the incident. Shortly thereafter McNabb called the meat director and related the history of torment and harassment, including sexual harassment, to which she had been subjected. She was told that Cub did not tolerate sexual harassment and that an immediate investigation would be commenced. He also offered her an immediate transfer to Cub Foods in the Burnsville store which McNabb rejected. The next morning McNabb met with Cub store people who were conducting the investigation. On March 9, 1983, she was offered a transfer to any other Cub store. McNabb rejected this offer, stating she was so upset and nervous that she could not work. As a result of the investigation, the meat cutter who was involved in the March 7, 1983 incident was suspended for seven days.

In December 1981 Cub had adopted a statement of policy regarding discrimination of any kind, including sexual discrimination. The policy outlined the procedures to be followed by both managers and employees if there was a complaint of discrimination. At that time this statement of policy was also printed in the company newsletter distributed to employees. When McNabb commenced employment with Cub in 1983, however, she was not given a copy of the statement of policy nor is there any evidence that she knew of the existence of the policy or the procedures she was to follow if subjected to discrimination or harassment. Based on this record her claim was ultimately denied by the Commissioner of Economic Security.

The issues presented are:

1. Whether employer knew or should have known that employee was being sexually harassed so that her voluntary separation from employment was with good cause attributable to the employer.

2. Whether the employer made a suitable offer of reemployment.

1. Minn.Stat. § 268.09 (1982) allows an employee to recover unemployment compensation if the separation from employment was with good cause attributable to the employer. Minn.Stat. § 268.09, subd. 1(1) provides in pertinent part:

A separation shall be for good cause attributable to the employer if it occurs as a consequence of sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other conduct or communication of a sexual nature when: (1) the employee's submission to such conduct or communication is made a term or condition of the employment, (2) the employee's submission to or rejection of such conduct or communication is the basis for decisions affecting employment, or (3) such conduct or communication has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment *and the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action.*

Minn.Stat. § 268.09, subd. 1(1) (1982) (emphasis added). The statute requires that

two elements be satisfied: first, that the employer knew or should have known of the existence of harassment; second, that the employer failed, despite that knowledge, to take timely and appropriate action.

One factor considered in denying McNabb unemployment compensation was that she had not specifically advised Cub that she was being sexually harassed. Cub's discrimination policy adopted in 1981 seems to be adequate to meet the appropriate standards established by statute and case law regarding employee discrimination. The problem in this case is Cub's failure to communicate that policy to new employees. The evidence is clear that McNabb was never given a copy of the statement of policy and was never acquainted with this policy by any other means. Thus, at the time she was subjected to harassment, both sexual and nonsexual, she had no knowledge of the procedures she was to follow in filing a complaint about the harassment she was suffering.

 It is clear from our decision in *Larson v. Department of Economic Security*, 281 N.W.2d 667 (Minn.1979), that notice of harassment to management is essential to a claim for benefits. In *Larson*, relator was employed as a janitor at the Orpheum Theater. Approximately three months after he began work he terminated his employment. Larson was subjected to much taunting from fellow employees on a nightly basis. On one occasion a co-worker spat on him and teased him. It took Larson six weeks to report his problem and then he disclosed only the spitting incident. *Id.* at 668. An employee later threw paper cups at him and one time struck him in the stomach. The manager, after being told about the spitting incident, promised to speak with the employees and directed Larson to inform him of future abusive conduct. Larson never reported anything after the spitting incident though the problems continued. This court, affirming the commissioner's decision denying benefits, held:

> The record indicates that relator is of reduced physical stature and is afflicted with a speech impediment. While he stated that he feared that he would be harmed by the larger coworker and that he so informed the manager, the manager stated that he spoke with the coworker and the latter denied the actions. The manager suggested that relator return to him if the situation worsened, but relator chose not to do so and instead made a unilateral decision to quit without notice. When questioned about his failure to seek relief from the manager, relator explained that he "just didn't think of it."
>
> Under the circumstances presented, once relator was provided with the expectation of assistance from his employer in eliminating his alleged fear of harm from a coworker, the burden was upon him to fully apprise the employer of the continuing facts giving rise to that fear. Without this full knowledge, it was reasonable for the employer to assume that the problem had been corrected.

*Id.* at 669.

*Larson* is readily distinguishable from the instant case because there were several complaints from McNabb, none of which was followed up by management.

This case is like *Continental Can Co. v. State of Minnesota*, 297 N.W.2d 241 (Minn. 1980). *Continental Can* established employer culpability if the employer "knew or should have known" that sexual harassment was taking place. 297 N.W.2d at 249. *See also, Hussa v. Employment Security Dept.*, 34 Wash.App. 857, 664 P.2d 1286 (1983). It involved management acceptance of an environment of sexual harassment. *See, e.g., Heelan v. Johns-Manville Corp.*, 451 F.Supp. 1382, 1390 (D.Colo. 1978). Parallels may be drawn between *Continental Can* and this case showing that the employer knew or should have known McNabb was being sexually harassed.

There are two specific incidents which occurred prior to March 7 which would indicate communication of complaints of harassment to management personnel. The first involved the statement of McNabb's immediate supervisor that he

knew the harassment was going on and that she had been hit. Cub has taken the position that this event did not necessarily signify that McNabb's supervisor knew that sexual harassment was occurring. That begs the question. Obviously, since he knew that she had been hit by a fellow employee some sort of investigation was required. Further, it would seem logical that an investigation would have surfaced the entire problem. The second incident occurred when she was crying in the cooler and she advised the night meat manager that a meat cutter was touching and harassing her. This report required some investigation be made.

Cub argues that the people to whom the complaints were made were not true management personnel since they are also union members whose positions are mandated by union contract. Cub, however, admits that the meat department manager has responsibility to manage people. The manager, in conjunction with his supervisor, the district meat manager, also disciplines employees. Disciplinary sanctions are recommended by the meat department manager to the district meat manager. The meat department manager performs basically a "first level supervisory and managerial function."

From these admissions, it seems to be a clear legal conclusion that the meat department manager's knowledge should be imputed to Cub Foods. The meat department manager is given a management title and clothed with supervisory and managerial authority over subordinates in the meat department. The meat department manager is management's link to each store. He has contact with the district meat manager two or three times per week. Without the meat department manager, Cub Foods has no way to assess the day-to-day performance of its 20 meat department employees at each location. The meat department manager is upper management's conduit through which information travels up or down the chain of command.

The actual practice of Cub management and its employees belies its entire argument. For example, when a problem arose between McNabb and a meat cutter, the meat department manager, Chuck Kempner, called them into his office so the three of them could resolve their problems. On one other occasion McNabb confided in a fellow union employee and he recommended she discuss the sexual harassment problem with her meat department manager. When discipline was finally imposed on the meat cutter whom McNabb confronted in Kempner's office, it was based upon Kempner's recommendation and reports to the district meat manager. The record is replete with facts that demonstrate employees gave deference to and treated the meat department manager as their boss. The conclusion appears inescapable that the meat department manager is management. We adopt the appeal tribunal's reasoning on this point:

> The claimant's testimony is essentially unrefuted by the employer. In the first place, the tribunal believes that the claimant had good cause to quit because the employer knew for a fact that she was being harassed by the meat cutters. There is no evidence that the employer took any steps to prevent this. The tribunal knows of no rule of law nor has the employer cited any that it is required for any job or profession that a person is required to go through this type of hazing that college students were subjected to twenty-five to thirty years ago. Secondly, the tribunal believes that the employer either knew or through its own negligence by poor management amounting to no management at all should have known that the claimant was being sexually harassed. The employer may not hide behind the meat department manager being a member of the claimant's union when he was exercising management functions. She was not required to formally complain of sexual harassment of which the employer had knowledge.

■■ The next question is whether Cub Foods took timely appropriate and remedial action under Minn.Stat. § 268.09, subd. 1 (1982). The court in *Continental Can* sug-

**384**

gested several measures an employer could take to comply with the Human Rights Act which would be analogous in the instant case. An employer could disseminate an antiharassment policy, transfer the employee to another shift, or take disciplinary action or threaten such action against offending employees. 297 N.W.2d at 248 (citing with approval *Howard v. National Cash Register Co.*, 388 F.Supp. 603, 605 (S.D.Ohio 1975)).

Cub Foods did transfer McNabb following the incidents at the Brooklyn Park store, but did not distribute an antiharassment policy nor speak to offending employees. Cub Foods submitted no testimony whatsoever that it took any of these measures to ameliorate the working conditions existing at the Fridley store. The sexual harassment not only continued but worsened. The failure of management to timely discipline employees is strong evidence of acquiescence in discriminatory practices by subordinates. *Friend v. Leidinger*, 446 F.Supp. 361, 376 (E.D.Va.1977). An employer must act to prevent and correct harassment when it becomes aware of the problem. *See Fekete v. United States Steel Corp.*, 353 F.Supp. 1177, 1186 (W.D. Pa.1973). *See also, Munford v. James T. Barnes & Co.*, 441 F.Supp. 459, 466 (E.D. Mich.1977). The commissioner erred in reversing the appeal tribunal's award of benefits to McNabb. Cub Foods had knowledge of sexual harassment but failed to take timely and appropriate remedial action.

2. Cub Foods contends that even if it did not act to correct the harassment occurring at the Fridley store, its action in immediately offering McNabb employment at any of its other stores satisfied its obligation to her. We disagree. She had been transferred once and the harassment continued. Absent some showing which would reasonably satisfy the employee that the harassing conduct of the meat cutters would terminate, she was not required to accept a transfer. Under these facts Cub

Foods did not make a suitable offer of reemployment.

Reversed.