Carla J. GILLSON, Respondent,

v.

STATE of Minnesota DEPARTMENT OF NATURAL RESOURCES, et al., Respondents (C1–92–434), Appellants (C0–92–442),

Daniel Casey, et al., Appellants (C1–92–434), Defendants (C0–92–442),

John Guenther, et al., Defendants (C1–92–434).

Nos. C1–92–434, C0–92–442.

Court of Appeals of Minnesota.

Nov. 24, 1992.

Review Denied Jan. 28, 1993.

Gregg M. Corwin, Karin E. Peterson, St. Louis Park, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Sharon A. Lewis, Sp. Asst. Atty. Gen., St. Paul, for respondents (C1–92–434), appellants (C0–92–442).

Kerry L. Scott, St. Paul, Dean S. Grau, Minneapolis, for appellants (C1–92–434), defendants (C0–92–442).

Considered and decided by HARTEN, P.J., and FORSBERG and SHORT, JJ.

## OPINION

HARTEN, Judge.

In this sexual harassment action, the trial court granted judgment in favor of respondent Carla J. Gillson against appel-

lants Minnesota Department of Natural Resources, State of Minnesota and Daniel Casey. The state and the DNR dispute liability and challenge a mental anguish award, a civil penalty against the DNR, and an attorney fees award. Casey appeals entry of judgment against him individually and dismissal of his defamation counterclaim. We affirm in part, reverse in part and remand.

## FACTS

In 1977, Gillson started working for the DNR forestry division in Hill City. Over the next ten years, she achieved the highest clerk typist classification and received many commendations. Gillson testified that she found few opportunities for advancement in the DNR for women without college degrees.

In the spring of 1987, Gillson was approached by Casey. At that time, Casey was assistant supervisor for the DNR Blackduck area; he became the supervisor in October 1987. Casey told Gillson about a critical incident stress debriefing program (CISD). CISD provides group counseling and support to law enforcement and rescue personnel who have been involved in life and death situations. At Casey's invitation, Gillson applied to join CISD.

In late 1987 or early 1988, John Guenther, then-assistant commissioner of the DNR, and Casey established a CISD program. Gillson was accepted into the program, although she retained her regular job in Hill City. The CISD program was operated on a team basis; members came from all over the DNR. During the next year, Casey and Gillson assembled program materials. Casey maintained his home office in Blackduck and Gillson maintained her home office in Hill City.

Beginning in the spring of 1989, Casey and Gillson began monthly overnight trips for CISD. On the first trip, to St. Cloud, Casey gave Gillson an unwelcome kiss on the lips. Later that month, Casey and Gillson gave a CISD training session in Fargo–Moorhead. The night before the meeting,

Casey sat next to Gillson in the hotel whirlpool and stroked her legs. He later put his arm around her and kissed her on the neck. Gillson had trouble sleeping that night. The next day when the group was leaving for home, Casey kissed Gillson on the lips and said, "I love you, baby." Gillson testified that Casey's advances were unwelcome and embarrassing.

The next month, Casey and Gillson went to Duluth. Gillson testified that when she walked into Casey's motel room, Casey grabbed her and started kissing her. Gillson insisted that they get their work done. Gillson later asked Casey why he was "coming on" to her and told him she did not want a sexual relationship. Casey continued his advances and tried to convince her that a personal relationship would enhance their professional relationship. Gillson testified that she drove home the next day in a snowstorm to avoid staying overnight again.

One month later, Casey and Gillson again traveled to St. Cloud. Casey insisted that Gillson come to his room. He fondled her and kissed her on the lips. Gillson told him to stop, but he continued. She testified that she felt degraded.

Casey gave Gillson a very good performance evaluation for the period July 1, 1988 through July 1, 1989. He said:

[Gillson] does an outstanding job for the statewide CISD team. She has been involved in at least 70% of all the training we have done, has taken the lead in developing our guideline/handbook, and is the catalyst of our training program. [Gillson] has been with the team since its inception, and is an integral part of the base system.

[Gillson] devotes a lot of quality time to our CISD team, and we are very thankful for it. If any one of our team deserves recognition for outstanding contributions, it is [Gillson].

In October 1989, a governor's council on CISD was formed. Guenther was director of the council. Casey represented the com-

missioner of the DNR. Gillson was the reporter.

In October 1989, Gillson and Casey attended a CISD function in St. Paul. They stayed overnight. When Gillson was in Casey's room to work, Casey again made more sexual advances. Gillson testified that she told Casey she did not know how much more she could handle. Driving home the next day, Casey told Gillson that he had been forced to lower his job performance evaluation of Keila Miller, a clerk typist in his office, because she had complained about him touching her. Gillson testified that she took the story as a warning.

In January 1990, Casey, Guenther and Gillson traveled to Brainerd. Casey walked in on Gillson when she was in her hotel room dressing and refused to leave. Later in the evening, Gillson telephoned a friend. She complained about Casey walking in on her and said she was afraid to bring a sexual harassment suit because of Casey's influence over CISD, which meant a lot to her. In January or February 1990, Gillson told her Hill City supervisor that she was going to start cutting back on CISD work.

In February 1990, Casey and Gillson were in St. Paul for a governor's council meeting. After dinner, Casey insisted that Gillson come to his room. Casey again made sexual advances. After this incident, Gillson began avoiding Casey.

Also in February 1990, DNR employee Joanne Chapman, who later made charges against Casey, met Gillson at an annual clerical meeting in Rochester. Chapman testified that Gillson told her she was having a problem with Casey not leaving her alone. Chapman testified that Gillson acted as though she did not want to discuss it.

Linda Bruss, a DNR clerk typist in St. Cloud, testified that in March 1990, Gillson said she thought Guenther was not giving her recognition she deserved and was taking all the praise for the work she and Casey were doing.

In April 1990, Gillson wrote to Guenther and Casey to tell them she was going to cut back on CISD work. When Guenther got the letter, he called Gillson and asked her why she would not be at a meeting the next day. Gillson told him that Casey had been making her uncomfortable and she did not want to spend time alone with him anymore. Gillson testified that she did not tell Guenther exactly what happened because she was embarrassed, she did not want to be taken completely out of CISD, and she was afraid Guenther would think she had consented to Casey's advances.

Guenther testified that Gillson said Casey had not done anything more than she had; she told Guenther that she did not want him to talk to Casey. Guenther concluded that it was a mutual relationship. He arranged for Gillson to discontinue travel with Casey. Guenther told the then-DNR commissioner that Gillson first had said that Casey might or might not have sexually harassed her, then denied it was sexual harassment and called it a mutual relationship. The then-commissioner said there was no reason to investigate.

In early May 1990, Guenther asked Gillson what she was going to do about Casey. She said she was not going to do anything. Guenther told Gillson she had to do something about sexual harassment. When she said she could not do anything about it, Guenther did nothing further.

On May 8, 1990, Gillson and Guenther clashed at a council meeting. Gillson testified that Guenther was already upset because her name appeared on a conference brochure as one of the co-founders of CISD. When she heard Guenther criticizing the Hill City office, she told him he was wrong.

On May 17, 1990, Casey, Guenther and Gillson had a meeting arranged by Casey. Gillson told Guenther she did not think he had been giving her the credit she deserved. Casey, who in the past had agreed with Gillson that Guenther had not given her the credit she deserved, offered no

support. Guenther and Gillson began arguing again and both became angry. Gillson was hurt because she had come to the meeting to resolve problems. Guenther told her that if she thought she was so important, why not just run the whole program. Gillson testified she thought Guenther knew what kind of stress she was under. She threw a glass of water at him. As Gillson was leaving, she said "there is always sexual harassment and discrimination." According to Guenther, after Gillson left, Casey asked what she meant by that. Guenther responded, "I don't know, unless she means you." Guenther testified that Casey said, "I never did anything that she didn't do."

Guenther did not report or investigate Gillson's concerns about Casey. He did, however, recommend an independent assessment of Gillson's ability to handle stress. On June 1, 1990, Gillson was suspended for five days without pay for the water-throwing incident.

While neither Guenther nor Casey participated directly in the decision to discipline Gillson, she was required to submit to a psychological assessment as Guenther had recommended. Casey was consulted on the psychological assessment requirement and was chosen to tell Gillson that she could not return to CISD or out-of-state fire duty without a psychologist's release.

On June 1, 1990, Gillson made a complaint alleging sexual discrimination by Guenther. Gillson did not complain about Casey. She told the investigators that Guenther did not give her the credit she deserved and was rude to her. Gillson also reported that Guenther had called her "wench." The investigation team concluded that there was no evidence that Gillson had been sexually harassed by Guenther or was the object of discrimination. One investigator testified that the team found that Casey and Guenther would call Gillson the "wench" between themselves but never to her face.

In late June 1990, Tim Donovan, Gillson's supervisor at Hill City, asked Casey to fill out a second evaluation of Gillson's CISD work. Donovan did not include the evaluation in Gillson's performance review because Donovan thought the evaluation was unfairly low.

In July 1990, Gillson and the DNR received a letter from the psychologist who evaluated Gillson. He said that Gillson could resume her regular job duties including fire call-ups and CISD involvement. On September 4, 1990, Casey denied Gillson permission to attend a regular CISD meeting. Casey had discussed that decision with Guenther.

In September 1990, Guenther went to Mary O'Neill, DNR human resources director, and one of the investigators on Gillson's complaint against Guenther, and suggested that O'Neill question Gillson about her relationship with Casey. Guenther claimed that he did not contact O'Neill until the charges against him were cleared by letter of September 25, 1990.

On October 1, 1990, O'Neill and Gillson met. O'Neill brought up the subject of Casey. Gillson asked O'Neill not to pursue sexual harassment by Casey. O'Neill insisted that it must be investigated.

An investigation team was formed immediately. Gillson suggested that the team also look into whether Casey had sexually harassed Keila Miller and Joanne Chapman. Joanne Chapman told the team that during a June 1990 CISD conference Casey and Guenther both made sexual jokes and most conversations were turned into sexual comments. Chapman also told the investigators that Casey had physically sexually harassed her.

On November 14, 1990, the team found that evidence from several witnesses supported Gillson's allegations that Casey had "on many occasions * * * committed improper touching and [had] asked for sexual favors." The team found sufficient evidence to believe that the acts happened. The team also found that there was a supervisor/subordinate relationship when Casey and Gillson were working on CISD;

however, it disagreed with Gillson's "level of efforts to terminate" the relationship with Casey.

The team found "a pattern of philanderous behavior," "tendencies of revengeful behavior" and "lording perceived power over * * * subordinates" by Casey. It recommended that Casey be given a long suspension and relocated. On December 26, 1990, Casey was suspended for twenty days.

The suspension letter said that Casey's conduct toward Miller was sexual harassment, intimidation, and retaliation against a subordinate female employee. The letter also stated that Casey's conduct toward Chapman was sexual harassment. It then stated that Casey made sexual comments, committed improper touching and requested sexual favors of Gillson when she was on CISD assignments working as Casey's subordinate. It labeled the behavior "inappropriate conduct," and said, "this behavior occurred off duty and, therefore, has not been taken into consideration" as part of Casey's discipline.

In January 1991, Gillson commenced this lawsuit. On January 19, 1991, shortly after Gillson filed her complaint, Rodney A. Sando, the new commissioner of the DNR, discharged Casey, in part for his inappropriate conduct with Gillson. In the discharge letter, Sando said Casey's behavior with Gillson "is not acceptable and compromises the integrity of the supervisor/subordinate relationship, and reflects extremely poor judgment."

In early 1991, in an effort to dispel rumors about herself, Gillson sent a letter to two DNR area supervisors. Casey's defamation counterclaim is based on the statements in that letter.

On September 23, 1991, a pretrial hearing was held. The trial court denied the state's and the DNR's motion for an adverse mental examination of Gillson. At the hearing, Gillson dismissed her claims against all parties with the exception of her sexual harassment claim against the state and the DNR.

A trial to the court took place on October 17, 1991. The trial court filed its findings of fact, conclusions of law, order for judgment and memorandum granting judgment in favor of Gillson. The trial court later denied appellants' motions for a new trial. Casey, the state and the DNR filed separate notices of appeal. All appeals have been consolidated herein.

## ISSUES

1. Did the trial court err in holding the state and the DNR liable for the sexual harassment of Gillson?

2. Did the trial court err in denying the motion of the state and the DNR for a new trial on damages for mental anguish?

3. Did the trial court abuse its discretion in assessing a civil penalty?

4. Did the trial court abuse its discretion in awarding attorney fees?

5. Did the trial court err in holding Casey individually liable for the sexual harassment of Gillson?

6. Did the trial court err in dismissing Casey's defamation counterclaim?

## ANALYSIS

1. Minn.Stat. § 363.03, subd. 1(2)(c) (1990) provides that discrimination on the basis of sex with respect to terms and conditions of employment is an unfair employment practice. Discrimination on the basis of sex "includes sexual harassment." Minn.Stat. § 363.01, subd. 14 (1990). The state and the DNR do not appeal the trial court's findings and conclusions that Gillson was the victim of sexual harassment. Rather, they contend the trial court erred in holding them liable. We disagree.

The state and the DNR base their arguments on a mistaken assumption that the sexual harassment found by the trial court consisted solely of Casey's physical sexual advances. The trial court also found that Casey refused Gillson's request to return to CISD after she completed her discipline

because she had rejected his advances. The trial court concluded that Casey's harassment substantially interfered with Gillson's employment.

■ The state and the DNR also misconstrue the law. Minn.Stat. § 363.01, subd. 41(3) (1990) provides that an employer is liable for sexual harassment if "the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action." Without citation to authority, the state and the DNR interpret the statute to say that the employer is only liable for sexual harassment that occurs *after* the employer should have taken appropriate action.[1]

An employer, however, is

"liable for the discriminatory acts of its agents or supervisory personnel if it fails to investigate complaints of such discrimination. The failure to investigate gives tacit support to the discrimination because the absence of sanctions encourages abusive behavior. While * * * an employer is [not] automatically and vicariously liable for all discriminatory acts of its agents or supervisors, * * * an employer has an affirmative duty to investigate complaints of sexual harassment and deal appropriately with the offending personnel."

*Continental Can Co. v. State*, 297 N.W.2d 241, 247 (Minn.1980) (quoting *Munford v. James T. Barnes & Co.*, 441 F.Supp. 459, 466 (E.D.Mich.1977) (emphasis omitted)). "The failure of management to timely discipline employees is strong evidence of acquiescence in discriminatory practices." *McNabb v. Cub Foods*, 352 N.W.2d 378, 384 (Minn.1984).

■ The trial court found that Guenther had an affirmative duty to investigate in April 1990.[2] Factual findings "shall not be set aside unless clearly erroneous;" the trial court's ability "to judge the credibility of witnesses" is given "due regard." Minn.R.Civ.P. 52.01. The trial court's factual findings "will not be disturbed if they are reasonably supported by evidence in the record considered as a whole." *Hubbard v. United Press Int'l*, 330 N.W.2d 428, 441 (Minn.1983). As set forth below, we hold that the trial court's findings are not clearly erroneous.

■ The trial court found that Guenther was not justified in accepting Gillson "at her word" that she wanted to handle the matter on her own. The trial court noted that because of the oppressive nature of sexual harassment and its degrading effects on a victim, Guenther should have made sure that Gillson's decision was not made under duress.

Gillson told Guenther that she did not know if what Casey was doing was harassment. Nevertheless, Guenther took no steps to disseminate policy or put Gillson in touch with a harassment specialist. Furthermore, not only did Guenther fail to reassure Gillson that her CISD work would not be jeopardized, he minimized her accomplishments and became antagonistic toward her.

Additionally, the argument of the state and the DNR that Guenther was under no obligation to investigate because he thought there was a consensual relationship between Casey and Gillson does not pass muster. If the relationship was once "mutual," which the trial court did not

---

1. In the analogous statute of limitation context, Minnesota recognizes the doctrine of continuing violation. *See Hubbard v. United Press Int'l*, 330 N.W.2d 428, 440 n. 11 (Minn.1983). Under that doctrine, acts that occurred prior to the time period of the statute are actionable if "part of a continuing pattern of harassment" resulting from the failure to abide by "a dependable harassment policy * * * and to treat harassment with appropriate seriousness." *Melsha v. Wickes Cos.*, 459 N.W.2d 707, 710 (Minn.App. 1990), *pet. for rev. denied* (Minn. Oct. 25, 1990).

2. The trial court also found that knowledge could be imputed to the state and the DNR because Casey was both harasser and supervisor. We need not decide if the knowledge of Casey as a harassing supervisor should be imputed, because the trial court properly imputed knowledge based on its finding that Guenther knew or should have known of the sexual harassment and failed to act appropriately.

find, it certainly was no longer. Gillson had shown that it had become a problem and Guenther should not have allowed Casey to continue to exercise control over her. The trial court made specific findings that it found Gillson's evidence more credible than the evidence of the state and the DNR.

Furthermore, the record shows that Guenther and the then-commissioner did not abide by the DNR's own sexual harassment policy when they declined to investigate Casey.[3] The reliance of the state and the DNR on the DNR's commitment to its sexual harassment policy rings hollow considering the failure of the then-commissioner and his assistant to abide by that policy.

Moreover, neither Casey nor Guenther reported Gillson's comment about sexual harassment at the time of the water-throwing incident when they recommended that she be disciplined. Guenther failed to investigate Casey's tacit admission of sexual conduct between a supervisor and a subordinate.

Finally, the record is replete with evidence the DNR did not give proper attention to sexual harassment. Joanne Chapman testified that she thought her initial complaint was "swept under the rug." There was testimony that others in Casey's office noticed his treatment of Keila Miller and told her that she did not have to put up with it. The DNR's designation of Casey's sexual harassment of Gillson as "inappropriate conduct" also used a phrase undefined in the law which the trial court found purposefully vague and expedient.

We affirm the trial court's holding that the state and the DNR are liable for Casey's sexual harassment of Gillson.

■ 2. The trial court held that Gillson's mental condition was not put in issue simply because she was seeking damages for mental anguish or suffering under Minn.Stat. § 363.071, subd. 2 (1990). A sexual harassment plaintiff does not automatically place her mental condition in issue. *Kresko v. Rulli*, 432 N.W.2d 764, 770 (Minn.App.1988), *pet. for rev. denied* (Minn. Jan. 31, 1989) (citing *Robinson v. Jacksonville Shipyards, Inc.*, 118 F.R.D. 525 (M.D.Fla.1988)). Recoverable pain and suffering does not have to "be severe or accompanied by physical injury." *Bradley v. Hubbard Broadcasting, Inc.*, 471 N.W.2d 670, 677 (Minn.App.1991), *pet. for rev. denied* (Minn. Aug. 2, 1991). A trial court can award damages based on subjective testimony. *Id.* ("diminished sense of self-worth" and deterioration of relationship with children grounds for mental anguish award).

■ We reject the argument of the state and the DNR that Gillson suffered no mental anguish, and we refuse to limit her pain and suffering to each specific incident when Casey made his advances. *See Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991) (each episode has predecessors, impact may accumulate and "work environment created thereby may exceed the sum of the individual episodes"). We cannot, however, agree with Gillson that the trial court excluded consideration of her mental condition in determining damages. .

■ In denying the pretrial motion for an adverse mental examination, the trial court ordered that Gillson's "mental condition shall not be considered for the purpose of determining damages." The parties were entitled to rely upon that ruling. Nevertheless, in its findings of fact, conclusions of law, order for judgment and memorandum, the trial court said it "considered [Gillson's] testimony regarding increased stress and any related conditions (e.g. headaches, nightmares) only for the limited pur-

---

**3.** The DNR ultimately found Casey engaged in "inappropriate behavior" with Gillson and a DNR official testified it was grounds for discipline. We note that Guenther did not draw the same conclusion when Gillson first talked to him and did not, at least, instigate an investigation. *See McNabb*, 352 N.W.2d at 383 (only logical that a called-for "investigation would have surfaced the entire problem").

pose of determining [Gillson's] damages." It also stated that sexual harassment "adversely influenced and affected plaintiff's personality and sense of well-being." The state and the DNR argue that the trial court erred in denying their motion for a new trial on damages based on the trial court's violation of its own pretrial order. We agree. The trial court considered Gillson's mental condition in determining damages. The trial court's violation of its own pretrial order changed the rules and therefore "poisoned the well" as to damages. We are compelled to reverse the trial court's damage award and remand for a new trial on damages.[4]

3. We also must reverse the trial court's determination that Casey is personally liable. It is clear from the record of the pretrial hearing that Gillson dismissed all of her claims against Casey individually. To allow her to recover from him would unfairly penalize him for appearing at the trial to pursue his counterclaim.

4. Absent an abuse of discretion, we will not reverse a trial court's assessment of a civil penalty against the DNR pursuant to Minn.Stat. § 363.071, subd. 2. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 381 (Minn.1990). We cannot say that the trial court abused its discretion. We affirm the civil penalty.

5. It is within the trial court's discretion to determine an award of attorney fees pursuant to Minn.Stat. § 363.071, subd. 2. *See Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 630 (Minn.1988) (finding as to "reasonableness" necessary). The trial court made detailed findings of the factors outlined in *Hensley v. Eckerhart*, 461 U.S. 424, 430 n. 3, 103 S.Ct. 1933, 1937 n. 3, 76 L.Ed.2d 40 (1983). Our review of those factors does not show them to be clearly erroneous. *See Anderson*, 417 N.W.2d at 630. We affirm the trial court's award of attorney fees.

6. Finally, we affirm the trial court's dismissal of Casey's defamation counterclaim. We agree with the trial court that the underlying implications of the first two allegedly defamatory statements—that Casey had other complaints against him and had lowered performance evaluations because of rejection of his advances—were true. *See Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 889 (Minn.1986) (truth is defense). We also agree that the third allegedly defamatory statement—that the readers should ask themselves if they would want a female relative to spend the night with Casey—was not defamation per se and Casey did not prove damages. *See Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980) (must prove actual damages if statement is not defamation per se).

## DECISION

We affirm the trial court's holding that the state and the DNR are liable for the sexual harassment of Gillson. We also affirm the trial court's assessment of a civil penalty, award of attorney fees and dismissal of Casey's defamation counterclaim. We reverse the trial court's holding that Casey is individually liable. We also reverse the trial court's denial of the motion of the state and the DNR for a new trial on damages, and remand for a new trial on damages.

Affirmed in part, reversed in part and remanded.

SHORT, Judge (concurring specially).

I concur in this court's opinion. I write separately to express my view that the trial court's award of $100,000 in pain and suffering damages also is grounds for reversal. The record demonstrates: (a) Gillson admitted she did not suffer any ongoing psychological damages after the harass-

---

4. The state and the DNR may renew their motion for an adverse mental examination. We do not direct the trial court's ruling on such a motion. We also do not mean to infer that the amount of damages awarded by the trial court would be excessive had the trial court been consistent in its evidentiary rulings.

ment stopped; (b) Gillson's attorney conceded the amount of damages awarded is not supported by record evidence; (c) the trial court's consideration of medical and psychiatric evidence was contrary to its pretrial order that Gillson's mental condition would not be considered for purposes of calculating damages; and (d) the trial court adopted Gillson's proposed findings verbatim. Under these facts, the award of damages is excessive, not supported by the record, and constitutes an abuse of discretion. *See Palmer v. Haluplzok,* 294 F.Supp. 489, 492 (D.Minn.1969) (excessive verdicts are a danger to be avoided); *Ahrenholz v. Hennepin County,* 295 N.W.2d 645, 649 (Minn.1980) (no award can be sustained unless it is reasonable in light of the circumstances of the particular case); *McCormick v. Malecha,* 266 Minn. 33, 43, 122 N.W.2d 446, 453 (1963) ("the verdict in the case before us is excessive * * * because the record is without proof of facts which would establish damages in fair relation to the amount allowed").