**Lori A. TODD, Plaintiff,**

v.

**ORTHO BIOTECH, INC., Defendant.**

**Civil File No. 3–94–402.**

United States District Court,
D. Minnesota,
Third Division.

Nov. 22, 1996.

---

David A. Allgeyer and Ansis V. Viksnins of Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for plaintiff.

Howard B. Tarkow, Susan E. Oliphant, and James F. Hanneman of Maslon, Edelman, Borman & Brand, P.L.L.P., Minneapolis, MN, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR AMENDED JUDGMENT

DAVIS, District Judge.

The above-entitled matter came on for trial before the undersigned on June 12–23, 1995. Plaintiff brought this action alleging nine different counts based on the sexual assault she suffered on September 22, 1992, by defendant Ortho Biotech, Inc.'s National Director of Trade Relations and former National Sales Manager. Plaintiff's case was tried before a jury on the following claims:

1. Sexual harassment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2;
2. Retaliation discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–3(a);
3. Negligent supervision;
4. Negligent retention;
5. Negligent hiring;
6. Assault;
7. Battery;
8. False Imprisonment; and
9. Intentional infliction of emotional distress.

In addition, plaintiff's claims for sexual harassment and retaliation discrimination under Minn.Stat. §§ 363.01, subd. 41, 363.03, subd. 7 were tried to the Court.

After carefully considering the evidence at trial and the legal arguments made, and based upon observation of the witnesses and their credibility, the Court now makes and enters the following findings of facts, and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Defendant Ortho Biotech, Inc. ("Ortho") is a New Jersey Corporation with its principal place of business in Rariton, New Jersey. It is a subsidiary of Johnson & Johnson, a well known manufacturer and marketer of diverse medical products.

2. Plaintiff Lori Todd ("Ms. Todd") was hired by Ortho as a sales representative-product specialist in March, 1992.

3. Ortho sponsored a national sales meeting in Boston, Massachusetts during the period from September 20–24, 1992. Ms. Todd, an Ortho product specialist of only six months, attended the meeting. Attendance at the national meeting was virtually mandatory.

4. At the national sales meeting, Ortho hosted a hospitality suite, which included an open bar. Ms. Todd stopped in at the hospi-

tality suite on Monday, September 21, 1992, at approximately 11:30 p.m. At the hospitality suite, she was approached by Greer Jattan and Rob Gist, who were also product specialists at Ortho, and James Moreland ("Moreland"), a high ranking executive at Ortho, about going to a nearby jazz club. Moreland had recently been the National Sales Manager for the Company and had recently been laterally transferred to the position of National Director of Trade Relations. Ms. Todd agreed to go to the jazz club. The theme of the meeting hosted by Ortho was "Connections," and Ortho employees and managers were encouraged to "get to know one another."

5. The jazz club was closed. At plaintiff's suggestion the group proceeded to the Rattlesnake Bar to continue the evening. At the Rattlesnake, Moreland began drinking shots of Vodka. He and Ms. Todd exchanged sexually oriented jokes. He and Ms. Todd also discussed Ms. Todd's career goals and how he would be interacting with product specialists such as Ms. Todd in the future.

6. During the cab ride back to the hotel, Moreland whispered something into Ms. Todd's ear which she could not understand. She ignored him.

7. When they returned to the hotel, Moreland and Ms. Todd were alone in the lobby when their companions left to return to the hospitality suite. They entered an empty elevator together and proceeded to their respective rooms. When the elevator closed, however, Moreland grabbed Ms. Todd, and attempted to kiss her. She pushed him away, asking "What are you doing?" Moreland apologized. He then insisted that Ms. Todd accompany him into his room so that he could complete his apology. Ms. Todd suggested that was unnecessary. Nonetheless, Moreland repeatedly "insisted" she accompany him to hear his apology. Ms. Todd chose to comply with his request, hoping not to upset an upper level manager.

8. As soon as Ms. Todd entered Moreland's room, Moreland grabbed her, pinned her down, and attempted to rape her. When Ms. Todd began hyperventilating, Moreland relented and she escaped from the room.

9. Early on Tuesday, September 22, plaintiff called her sister in Florida who told her she should report the attack. During the day, plaintiff attended meetings and went shopping with friends. In the evening, she had dinner with another product specialist, Ellen Schoenberg, and told her about the attack. Ms. Schoenberg said she should report the incident, and suggested that she do so, to Chuck Ball, Director of Management Development, whom Ms. Schoenberg trusted.

10. On Wednesday morning, September 23, plaintiff approached Mr. Ball on her way to a business meeting, intending to report the attack. He wanted to talk, but plaintiff said it was a personal matter and she needed privacy. Mr. Ball was tending to conference business at the time. She did not ask Mr. Ball if there was another manager whom she could talk to at that time. Plaintiff did not tell Mr. Ball that she had been attacked or sexually harassed. Instead, they agreed to meet that night at the end of business.

11. Plaintiff attended the scheduled business meetings during the day.

12. In the last of three afternoon breakout sessions, plaintiff watched a skit about Ortho's bonus compensation performed by hired actors. Plaintiff and another product specialist felt the skit was offensive, but they did not complain to anyone.

13. The skit, which was sexually offensive, had a female product specialist pretending to be having sex on the other end of a 900 "dirty talk" number while a male sales manager talked about sales data. The skit also included one participate pinching another participant on the buttocks.

14. The evening of September 23, Chuck Ball and plaintiff met in her room. Plaintiff told Mr. Ball that Moreland had attacked her. Mr. Ball was shocked and listened sympathetically. He said he would do anything he could to help her and that he wanted to make her safe and that she would be protected. Mr. Ball then asked her for permission to involve Mr. Mangean to hear the allegations and determine the options for proceeding. She agreed.

15. Mr. Mangean arrived in the room and plaintiff repeated the story. She also showed

him bruises on her upper arms. Mr. Mangean said it appeared that a law had been violated and she had the right to contact the police. She did not want to do so. Mr. Mangean told her he needed to contact the company's attorney because he was concerned that a crime may have been committed. She agreed only that the company's attorney could be notified. She wanted nothing else done and she did not want Mr. Mangean to tell anybody else in the company about Moreland's alleged assault, including Moreland's superiors.

16. Mr. Mangean and Mr. Ball then asked her what she wanted to do. She said she wanted to go down to the dinner, so they escorted her and promised her they would sit where they could keep an eye on both her and Moreland. Mr. Ball also told her that, when she was ready to leave the dinner, he would escort her to her room.

17. After the dinner, plaintiff also reported to Mr. Hess that Moreland had attacked her.

18. In her room, plaintiff received a brief call from Moreland. She called Mr. Ball, who offered to arrange for her to move to another room if it would help her to feel safer. She said she felt safe in the room. That was plaintiff's last contact ever with Moreland.

19. Ms. Todd returned to Minnesota on September 24. Upon her return to Minnesota, Ms. Todd obtained medical attention. This medical attention included treatment for severe psychological problems resulting from the assault by Moreland, medication for anxiety and depression (that Ms. Todd took for over a year), and emergency room treatment at Abbott Northwestern Hospital.

20. On its Special Verdict form dated June 23, 1995, the jury found that Moreland used his actual or apparent authority at Ortho to further his harassment of Ms. Todd, or that he was otherwise aided in accomplishing his harassment by virtue of the position he had with Ortho.

21. The Court also finds that Moreland used his actual or apparent authority as an upper level manager at Ortho to further his harassment of Ms. Todd, or that he was

otherwise aided in accomplishing his harassment by virtue of the position he had with Ortho.

22. While the jury concluded that Ortho did not fail to take proper and effective remedial action, for the following reasons the Court finds that, while Ortho took action, its action was not prompt and effective on Ms. Todd: (a) Following the assault, Moreland harassed other Ortho female employees. (b) Even after Ms. Todd tried to report the assault, Moreland approached her at lunch and, after Ms. Todd made a full report to Ball and Mangean, Moreland called her in her hotel room, thereby greatly upsetting her. (c) Ms. Todd's first attempt to report the assault to Ball was delayed because he was busy coordinating the sexually offensive skit. When she was finally able to report the assault to Ball, Ms. Todd learned that he was not involved in such matters. (d) Ortho took approximately three weeks to determine that Moreland had, in fact, attempted to rape Ms. Todd, and failed to keep Ms. Todd informed of the investigation. (e) Ms. Todd was told that Moreland had been suspended pending the investigation, but in actuality that was not so. (f) Although Moreland was the harasser, during its investigation, Ortho pulled Ms. Todd's criminal record from her personnel file, but never conducted a criminal background check on Moreland. (g) Even after Ortho concluded that Moreland had nearly raped Ms. Todd, it provided Moreland with a significant severance package worth over $100,000 in cash, while taking various adverse actions against Ms. Todd.

23. The various adverse actions included the following: At a June 1993 sales meeting, Tom Amick, Ortho's new National Sales Manager, refused to shake Ms. Todd's outstretched hand and refused to make eye contact. Other Ortho employees avoided and ignored Ms. Todd after she reported the assault. Ms. Todd sought to extend an unpaid leave of absence because she was not ready to return to work. Although Ortho had granted a six-month extended unpaid leave of absence to another Ortho employee, Ortho denied Ms. Todd's request contending that she had quit when she had not returned to work on the date that Ortho wanted her to

return and claiming that her sales territory was very important to Ortho, even though Ortho dissolved the territory three months after Ms. Todd's departure from the company.

24. As a result of the sexual assault by Moreland and as a result of Ortho's actions, Ms. Todd has suffered past and future wage loss and pain, emotional distress and loss of enjoyment of life. Because of the need for extensive psychological treatment, including medication, Ms. Todd was unable to work full-time at Ortho after September of 1992, and eventually found herself unable to work at all. She subsequently moved in with her sister and brother-in-law in Houston and recently moved with them to Florida. While Ms. Todd has tried to start a business from her home, thus far she has been unable to get on with her life. As a direct and proximate result of the attempted rape, Ms. Todd has suffered vivid and terrifying nightmares, anxiety, phobias and other extreme psychological difficulties, including post-traumatic stress disorder. She is unable to maintain meaningful new personal relationships, travel, or work at gainful employment.

### CONCLUSIONS OF LAW

■ 1. Ms. Todd has established a case of sexual harassment against Ortho pursuant to the Minnesota Human Rights Act, Minn. Stat. § 363.01, subd. 41. In analyzing cases under the Minnesota Human Rights Act, courts look to Title VII precedent. *Fore v. Health Dimensions, Inc.*, 509 N.W.2d 557, 560 (Minn.Ct.App.1993).

(A) Based on her status as a woman, Ms. Todd belongs to a class of persons protected by the Minnesota Human Rights Act.

(B) Ms. Todd was subjected to unwelcome sexual harassment including the brutal attempted rape perpetrated by Ortho's upper level manager and the sexually offensive skit.

(C) The sexual harassment experienced by Ms. Todd was based upon her sex.

(D) The sexual harassment experienced by Ms. Todd affected terms, conditions, and privileges of her employment. As a result of the sexual harassment, Ms. Todd

was unable to work full-time at Ortho, and eventually found herself unable to work at all.

(E) The sexual harassment suffered by Ms. Todd was sufficiently severe to affect a term, condition, or privilege of employment.

■ 2. Ortho is liable for the sexual harassment perpetrated by Moreland, its upper level manager. Moreland used his actual or apparent authority at Ortho to further his sexual harassment of Ms. Todd, or he was otherwise aided in accomplishing harassment by virtue of the position he had with Ortho. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1985); *Karibian v. Columbia University*, 14. F.3d 773, 780 (2d Cir.1994) (*citing* Restatement (Second) of Agency §§ 219(1) & (2)(d)), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1418 (10th Cir. 1987); *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1514–15 (11th Cir.1989); *Kay v. Peter Motor Co., Inc.*, 483 N.W.2d 481, 485 (Minn.Ct.App.1992).

■ 3. Alternatively, Ortho is liable for the sexual harassment perpetrated by Moreland because it knew or should have known of the sexual harassment and failed to take prompt and effective remedial action. *See Bersie v. Zycad Corp.*, 417 N.W.2d 288, 291 (Minn.Ct.App.1987). Because Moreland was an upper level manager and perpetrator of the harassment, knowledge of the sexual harassment is imputed to Ortho. *See Giuliani v. Stuart Corp.*, 512 N.W.2d 589, 595 (Minn.Ct.App.1994); *McNabb v. Cub Foods*, 352 N.W.2d 378 (Minn.1984). Ortho failed to take prompt and effective remedial action to stop the sexual harassment, remedy its resulting effects on Ms. Todd, and generally deter harassment in its workplace. *See McNabb v. Cub Foods*, 352 N.W.2d 378, 384 (Minn.1984) (while the employer's transfer of the plaintiff to a new location ended the harassment by the original harassers, it did nothing to reduce the possibility that the plaintiff would be harassed at the new location or to eliminate the hostile working environment); *Fuller v. City of Oakland,* 47 F.3d

1522 (9th Cir.1995) (whether a defendant takes prompt and remedial action to address sexual harassment depends not only on the prevention of future harassment between the particular victim and perpetrator, but also whether the defendant's actions serve as a specific and general deterrent to work place harassment in general). After the sexual assault, Ms. Todd was subjected to viewing a sexually offensive Ortho-sponsored skit. Furthermore, following the assault, Moreland harassed other Ortho female employees, and even after Ms. Todd had tried to report the harassment, Moreland approached her at lunch and called her later in her hotel room. During its three-week long investigation, Ortho failed to keep Ms. Todd informed and misled her into believing that Moreland had been suspended pending the investigation. Although Ms. Todd was the victim, as part of Ortho's investigation, it pulled her criminal record, yet never pulled any criminal record on Moreland. Even after Ortho concluded that Moreland had attempted to rape Ms. Todd, Ortho managers and employees treated her as a nonperson, and Ortho denied Ms. Todd the accommodations she needed to deal with her trauma. Ortho denied Ms. Todd's requests for a transfer and an extended unpaid leave of absence. In contrast, although Ortho ultimately terminated Moreland, it provided him with a significant severance package.

■ 4. The jury concluded that Ms. Todd has sustained damages as a direct and proximate result of sexual harassment in violation of Title VII of the Civil Rights Act as follows:

| $100,000 | Loss of earnings |
| 90,000 | Pain, emotional distress and loss of enjoyment of life |
| 28,000 | Loss of earning capacity |

5. The Court concludes that Ms. Todd has sustained damages as a direct and proximate result of sexual harassment in violation of the Minnesota Human Rights Act.

[6–8] 6. Under Minn.Stat. §§ 363.14, subd. 2 and 363.071, subd. 2, the Court may award compensatory damages in an amount up to three times the actual damages sus-

tained. Treble damages are a fixed multiple of compensatory damages and are not related to the culpability of the employer. *Melsha v. Wickes Companies, Inc.,* 459 N.W.2d 707, 709 (Minn.Ct.App.1990); *Kriss v. Sprint Communications Co.,* 851 F.Supp. 1350, 1360–61 (D.Minn. Apr. 1, 1994) (Murphy, J.). Consideration must be given to whether a multiple is necessary to fully compensate the victim. *Melsha,* 459 N.W.2d at 709; *Kriss,* 851 F.Supp. at 1360–61. Under the circumstances, treble damages are necessary to compensate Ms. Todd for the severe and debilitating sexual harassment and past and future wage loss she has suffered. Accordingly, Ms. Todd is entitled to compensatory damages in the amount of $384,000 ($128,000 × 3).

■ 7. The statutory scheme also provides for other damages and recovery of fees. The Court finds that Ms. Todd is entitled to damages for mental anguish or suffering she experienced as a result of the sexual harassment in an amount equal to the jury's determination of $90,000.

■ 8. The Court is required to assess a civil penalty payable to the State of Minnesota against any defendant found to have violated the Minnesota Human Rights Act, Minn.Stat. §§ 363.14, subd. 2 and 363.071, subd. 2. The amount of the penalty is determined by "taking into account the seriousness and extent of the violation, whether the violation was intentional, and the financial resources of the [defendant]." Minn.Stat. § 363.071, subd. 2. Based on all of the factors set forth in the Minnesota Human Rights Act, the Court assesses a civil penalty against Ortho in the amount of $50,000.

■ 9. Finally, the Court concludes that Ms. Todd is entitled to an award of reasonable attorney fees and costs in conjunction with this lawsuit pursuant to Minn.Stat. § 363.14, subd. 3 and Title VII. The exact amount of attorney fees will be calculated by the Court after Ms. Todd's counsel submits an affidavit outlining the costs and fees incurred by Lindquist & Vennum in this matter.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, the Special Verdict form dated June 23, 1995, and all the files, records, and proceedings herein, the Court amends its prior judgment, and IT IS HEREBY ORDERED that:

1. Judgment be entered in favor of defendant as to plaintiff's claim of negligent retention (Count IV);
2. Judgment be entered in favor of defendant as to plaintiff's claim of negligent supervision (Count III);
3. Judgment be entered in favor of defendant as to plaintiff's claim of assault (Count VI);
4. Judgment be entered in favor of defendant as to plaintiff's claim of battery (Count VI);
5. Judgment be entered in favor of defendant as to plaintiff's claim of false imprisonment (Count IX);
6. Judgment be entered in favor of defendant as to plaintiff's claim of intentional infliction of emotional distress (Count VII);
7. Judgment be entered in favor of defendant as to plaintiff's claims of retaliation (Count II);
8. Plaintiff's claim of negligent hiring (Count V) is DISMISSED with prejudice;
9. Judgment in the amount of four hundred seventy-four thousand dollars ($474,000) be entered in favor of plaintiff on her claims of sexual harassment under Title VII of the Civil Rights Act and the Minnesota Human Rights Act (Count I);
10. Defendant shall pay a civil penalty to the State of Minnesota in the amount of $50,000; and
11. Plaintiff shall be awarded reasonable costs and attorney fees. Plaintiff shall submit an itemized application for attorney fees with supporting documents which reasonably detail her fees and costs within 30 days of the entry of the date of this Order. Defendant shall respond within 10 days thereafter.

LET JUDGMENT BE ENTERED AC-CORDINGLY.