Katharine NAVARRE, Respondent,

v.

**SOUTH WASHINGTON COUNTY SCHOOLS, Appellant.**

Northwest Publications d/b/a Pioneer Press, et al., Defendants.

No. C4–00–2242.

Court of Appeals of Minnesota.

Sept. 4, 2001.

Stephen W. Cooper, Kathryn J. Cima, The Cooper Law Firm, Ch., Minneapolis, MN, (for respondent).

Lawrence J. Hayes, Jr., Jennifer K. Anderson, Knutson, Flynn & Deans, P.A., Mendota Heights, MN, (for appellant).

Mark R. Anfinson, Minneapolis, MN, (for amicus curiae Minnesota Newspaper Association).

Considered and decided by
SHUMAKER, Presiding Judge,
AMUNDSON, Judge, and
STONEBURNER, Judge.

## OPINION

STONEBURNER, Judge.

Katharine Navarre, a former teacher in the South Washington County School District, sued the school district, her supervisors, and Northwest Publications d/b/a Pioneer Press for defamation and for intentional and negligent infliction of emotional distress. Navarre also asserted a claim against the school district for violating the Minnesota Government Data Practices Act (MGDPA) by releasing private personnel data. Only Navarre's MGDPA claim against the school district survived pretrial motions.

At trial, the district court instructed the jury that the school district had violated the MGDPA by releasing private personnel data on six different occasions. The jury returned a verdict for damages in the amount of $520,000 and recommended that the school district be required to apologize to Navarre in writing.

On appeal from the denial of posttrial motions, the school district argues the district court erred in concluding that the school district violated the MGDPA. Additionally, the school district argues the district court abused its discretion in (1) submitting Navarre's claim for damages to the jury, (2) prohibiting the district from introducing information about Navarre's reputation and emotional state prior to the release of data, (3) instructing the jury on constructive discharge, (4) finding that neither counsel nor the jury had committed misconduct, and (5) denying the school district's motion for remittitur. Because we conclude that the district court erred in determining the number and substance of the school district's MGDPA violations and that the court's evidentiary rulings substantially prejudiced the school district, we reverse and remand.

## FACTS

Katharine Navarre has taught in the school district since January 1988. In 1996, Navarre was assigned to teach sixth-grade communications at Hillside Elementary School for one year. As the school year progressed, the school district began to receive complaints from teachers, students, and parents regarding Navarre's performance. Teachers complained that Navarre's students were often unsupervised and that Navarre failed to appropriately maintain behavior charts shared by the sixth-grade teachers. Students complained that they were not being challenged and that Navarre had threatened them if they complained. Parents echoed their children's concerns and complained about their own interactions with Navarre.

After informally monitoring Navarre, discussing the complaints with her, and offering assistance, Principal Timothy Bess gave Navarre written notice of the complaints and asked Navarre to provide samples of assignments she had given the students. Based on Navarre's submissions, school officials concluded that Navarre had met the minimum standards of the school district's prescribed curriculum.

The school district also reviewed Navarre's grading and student-performance records and noted some problems. During the review process, the school district continued to receive complaints. On May 15, 1997, the school district placed Navarre on a paid leave of absence. On May 19, the principal sent a letter to sixth-grade parents advising them that Navarre had been placed "on medical leave for the remainder of this school year."

On May 28, Assistant Superintendent Stanley Hooper sent parents a letter stating he recognized that:

[P]arents have a legitimate concern about knowing whether their children have been successful in the Communications curriculum, and that the stories from children are numerous and sometimes alarming regarding the characteristics of the instructional program they received.

The purpose of Hooper's letter was to notify parents that the school district would administer the communications portion of the Iowa Test of Basic Skills to evaluate what students had learned and to ask parents to explain the seriousness of the test to their children. A Hillside parent sent Hooper's May 28 letter to Pioneer Press reporter Theresa Monsour. On May 29, Monsour interviewed Hooper, who spoke about the school district's response to parents' and students' concerns. Monsour's notes of the interview attribute the following statements to Hooper:

parents have called hillside. teachers have sat kids down and talked in detail. some said did do some things. we aren't comfortable that some of what they are talking about isn't valid. so doing standardized to see what learned.

said parents were calling principal and said getting strong stories about what was going on. one day principal did sub. he asked children more information based on what parents were talking about. he had been aware of some of those issues for while. frequency of calls. some parents were concerned about their children but weren't attributing it to lack of instruction. others said towards spring of year, problems.

some children described it as social hour. teacher had difficulty in classroom management. from kids point of view, out of hand. principal, he indicated that may have been the case. he was not seeing that in other classrooms. kids move from room to room. were not having difficulty in other rooms.

* * * *

had not had other problems that I know of. nothing where anything formal had been done.

\* \* \* \*

it's unusual in terms of number of parents calling dr. bess and myself.

I've had four calls and other pending. playing telephone tag. bess has had more than that.

said district had been working with the teacher. the teacher had been responding to what teacher was, helping her learn better classroom management. earliest calls from parents were concerns about not learning in classroom. principal worked with teacher to get documentation that teacher had been working with the students, examples of student work. She was providing some information in response to that.

said he didn't get calls until this spring. first was two weeks ago. doesn't know how long bess has.

\* \* \* \*

said year started out okay, classroom management okay. fell apart with spring.

she was asked for grades. she gave out grades. she did give some homework out during the year.

On May 30, the Pioneer Press published an article under the headline "100 kids who learn 'nothing' face summer school." The article reported on the concerns expressed by parents and students and on the school's response and included several quotations attributed to Hooper.

In response to the article, the school district issued a May 30 press release from Superintendent Dan Hoke:

The allegations are serious enough and substantiated enough that we took the action of suspending the teacher and testing the students.

\* \* \* \*

We first heard concerns about the situation last fall, when parents called to report that their children were having difficulty learning the communications curriculum. We immediately followed up by investigating these concerns.

This spring the concerns shifted from concern about student performance to concern about the teacher's teaching methods. The principal investigated these concerns at the time and the investigation continues.

On the same day, Channel 11 news videotaped an interview with Hoke, during which he stated:

[the principal] would visit with the teacher, he would observe the teacher and then eventually he started into the. classroom to teach for himself. So as he got more and more evidence, he was also concerned. By us admitting there was something wrong by suspending the teacher\* \* \*.

On June 11, the Pioneer Press published a follow-up article under the headline "Students learned something after all," with the sub-headline "Despite learning 'nothing,' students pass reading test." On July 3, the school district's human-resources manager, Perry Palin, responded to a request for information from Monsour in a letter that stated: "the school district received complaints from parents and students alleging concerns involving Ms. Navarre's classroom management and instructional methods."

Navarre brought this action in July 1997. Navarre alleged that she suffered emotional damage, humiliation and embarrassment, and loss of reputation as a result of the MGDPA violations. But she did not claim wage loss or constructive discharge.

In August 1997, the school district sent Navarre a formal notice of assignment to Woodbury Elementary School, where she

had previously worked well with the principal, and a plan of assistance designed to correct problems the school district believed existed based on its investigation of the previous year's complaints. Navarre requested a medical leave of absence through September 1997. Instead of returning to work when the leave expired, Navarre filed a grievance regarding the notice of assignment and the plan of assistance. Navarre did not pursue arbitration when the grievance was denied. In March 1998, the district court granted Navarre's motion to supplement her complaint with allegations related to events that occurred after the original complaint was served. The causes of action asserted in the original complaint were not changed.

In April 1999, the district court granted summary judgment to the Pioneer Press and the school district on Navarre's claims of defamation and negligent and intentional infliction of emotional distress, and dismissed the claims against school-district officials in their individual capacities. The district court granted Navarre partial summary judgment against the school district on her MGDPA claim holding that, as a matter of law, Bess's May 19 letter and Palin's July 3 letter violated the MGDPA. The court concluded that Hooper's May 28 letter, several direct quotations attributed to Hooper in the April 30 Pioneer Press article, and the disclosure that Navarre had been placed on paid leave, did not violate the MGDPA. The district court concluded that a fact question existed about whether Hooper violated the act in the April 29 interview with Monsour by disclosing that the district had been working with Navarre on her classroom-management skills.

Before trial, the district court granted Navarre's motions to exclude (1) evidence of her medical history, which included ongoing treatment for emotional issues, and (2) evidence that Navarre's teaching performance had been unsatisfactory. At the same time, the court denied the school district's motion to exclude writings and statements that the court had determined did not violate the MGDPA.

At the conclusion of the presentation of evidence, the court, on Navarre's motion, reversed its pretrial determination and concluded that the school district violated the MGDPA by releasing private personnel data on six occasions. The school district moved for dismissal, arguing that Navarre had not established any compensable damages resulting from the MGDPA violations. The school district also objected to a requested instruction on constructive discharge and renewed its request for an instruction on the nature and disposition of all counts against the Pioneer Press. The district court implicitly denied the school district's motion and objections.[1]

At the conclusion of closing arguments, the school district moved for a mistrial based on Navarre's counsel's misconduct during closing argument. The court denied the school district's motion, instructed the jury, and submitted the case to the jury only on the issue of damages. The jury awarded Navarre $200,000 for loss of reputation, $250,000 for emotional distress, and $70,000 for loss of income and/or earning capacity. The jury also requested that the court require the school district and district officials to issue Navarre a written apology.

The school district moved for judgment notwithstanding the verdict or, alternatively, for a new trial or remittitur. Navarre

1. The record reflects that the district court "noted" but did not rule on the motion and objections.

moved for attorney fees and costs. The court denied the school district's posttrial motions and awarded Navarre $35,560.07 in attorney fees and $5,880.19 in costs. This appeal followed.

## ISSUES

I. Did the district court err in determining that the school district violated the MGDPA?

II. Did the district court abuse its discretion by precluding the school district from presenting evidence of Navarre's pre-existing emotional problems and reputation and/or by denying the school district's motion for a directed verdict on Navarre's claim for damage to reputation?

III. Did the district court err by denying the school district's motion for JNOV on Navarre's constructive-discharge and wage-loss claims?

IV. Did the district court abuse its discretion in denying the school district's motion for a new trial based on Navarre's counsel's alleged misconduct during closing argument and/or the jury's alleged misconduct?

## ANALYSIS

■ Judgment notwithstanding the verdict (JNOV) is proper when the verdict is contrary to the law or manifestly inconsistent with the evidence viewed in the light most favorable to the verdict. *Diesen v. Hessburg*, 455 N.W.2d 446, 452 (Minn.1990). The denial of a motion for JNOV is subject to de novo review and must be affirmed if the record contains "any competent evidence reasonably tending to sustain the verdict." *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn. 1998) (quotation omitted).

■ Ordinarily, the decision to grant or deny a new trial lies within the sound discretion of the district court and will not be reversed absent a clear abuse of that discretion. *Halla Nursery, Inc. v. Baumann–Furrie & Co.*, 454 N.W.2d 905, 910 (Minn.1990). But when the decision to grant or deny a new trial is based on an error of law, the standard of review is de novo. *Id.* This court must affirm the denial of a new-trial motion unless the verdict is " 'manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict.' " *Raze v. Mueller*, 587 N.W.2d 645, 648 (Minn.1999) (quoting *Roemer v. Martin*, 440 N.W.2d 122, 124 (Minn.1989)). We must also reconcile the jury's answers to the special verdict in a " 'reasonable manner consistent with the evidence and its fair inferences.' " *Id.* (quoting *Reese v. Henke*, 277 Minn. 151, 155, 152 N.W.2d 63, 66 (1967)). Special verdicts should stand if the jury's answers can be reconciled with the evidence on any theory. *Id.*

### I

■ The school district first argues it is entitled to a new trial because the district court erred in determining that the school district released private personnel data in violation of the MGDPA. Whether the school district violated the MGDPA is a question of law subject to de novo review. *Washington v. Independent Sch. Dist. No. 625*, 610 N.W.2d 347, 349 (Minn.App.2000).

The MGDPA regulates the collection and dissemination of all government data maintained by state agencies and political subdivisions. *See* Minn.Stat. § 13.01–.99 (1996). In the two decades since its enactment, the MGDPA has become long and complicated, but the act has generated surprisingly little case law. This action emphasizes the complexity of balancing the public's legitimate interest in educational

issues against the legitimate and protected privacy interest of public employees in personnel matters.

■ Although the MGDPA establishes a presumption that all government data are public unless federal law, a state statute, or a temporary classification provides otherwise, the act presumes that personnel data are private unless classified as public. *See* Minn.Stat. §§ 13.01, subd. 3, 13.43. The MGDPA classifies as public "the *existence and status* of any complaints or charges against the employee, regardless of whether the complaint or charge resulted in a disciplinary action." *Id.* § 13.43, subd. 2(a)(4) (emphasis added). But *details* about an existing complaint or charge are nonpublic unless there has been a "final disposition of any disciplinary action." *Id.*, subd. 2(a)(5). A "final disposition" occurs when a state agency "makes its final decision about the disciplinary action, regardless of the possibility of any later proceedings or court proceedings." *Id.*, subd. 2(b). In cases involving public employees covered by a collective-bargaining agreement providing for grievance arbitration, a final disposition does not occur until the conclusion of the arbitration proceedings. *Unke v. Independent Sch. Dis. No. 147*, 510 N.W.2d 271, 273 (Minn.App.1994), *review denied* (Minn. Mar. 15, 1994). Because in this case there was never a "final disposition" as defined by the act, details contained in government data about specific complaints against Navarre remained private at all relevant times.

In response to Navarre's motion for summary judgment, the district court determined before trial that the school district violated the act on two occasions and that there was a fact question about a third violation. After all of the evidence was presented at trial, however, the district court changed its ruling on the liability issue. The district court's jury instruc-

tions identified specific statements made on six separate occasions as MGDPA violations. After carefully reviewing the data released in light of the applicable law, we conclude that not all of the statements submitted to the jury constituted MGDPA violations. We address the alleged violations in chronological order.

### A. Principal Bess's May 19 letter stating that "Ms. Navarre will be out on a medical leave for the remainder of this school year."

■ The district court reasoned that information concerning the *nature* of Navarre's leave was private personnel data. But the MGDPA classifies as public:

> data that are only used to account for employee's work time for payroll purposes, except to the extent that the release of time sheet data would reveal the employee's reasons for the use of sick or other medical leave * * *.

Minn.Stat. § 13.43, subd. 2(a)(8). And the Commissioner of Administration has opined that while information concerning the specific reasons for an employee's use of medical leave is private data, information that an employee is on administrative leave for medical reasons is public data under Minn.Stat. § 13.43, subd. 2. Op. Minnesota Dep't Admin. No. 99–019 (July 7, 1999) (concluding that disclosure to a city council that a complaint or charge had been made against an employee and that employee was on administrative leave for medical reasons was permissible); *see also* Minn.Stat. § 13.072 (providing that commissioner of department of administration is charged with authority to issue advisory opinions, which are not binding on state agency whose data are subject of opinion but must be given deference by a court in proceedings involving the data). The use of the word "medical" in conjunction with the word "leave" does not violate the act.

The district court erred by instructing the jury that Bess's May 19 letter to parents violated the MGDPA.

**B. Assistant Superintendent Hooper's May 28 letter to parents stating that "the stories from children are numerous and sometimes alarming regarding the characteristics of the instructional program they received."**

■ The district court concluded that Hooper's letter violated the MGDPA because the letter disclosed more than the existence and status of a complaint against a public employee, in violation of Minn. Stat. § 13.43, subd. 2(a)(4). In arriving at that conclusion, the court assumed that Hooper's letter disclosed personnel data within the meaning of the MGDPA. But Hooper's letter does not disclose "personnel data" as that term is defined in the MGDPA.

"Personnel data" means "data on individuals collected because the individual is or was an employee of * * * a state agency * * *." *Id.*, subd. 1. "Data on individuals" means

> all government data in which any individual is or can be identified as the subject of that data, unless the appearance of the name or other identifying data can be clearly demonstrated to be only incidental to the data * * *.

*Id.* § 13.02, subd. 5. Navarre was not the subject of and was not identified in Hooper's letter. Hooper's letter was about the steps the school district intended to take to ensure that the children learned what they needed to learn before moving on to seventh grade. Read in context, the letter was a communication to parents recognizing the concerns generated by "numerous and sometimes alarming" stories about the instruction their children received in their communications class, and describing the

school district's response to those stories. The characterization "numerous and sometimes alarming" refers to the children's stories, not to complaints that would fall within the MGDPA.

Because the letter did not identify Navarre and any implicit reference to her was incidental to the subject of the letter, the information in the letter does not constitute "personnel data." *See Edina Educ. Ass'n v. Board of Educ. of Indep. Sch. Dist. No. 273*, 562 N.W.2d 306, 311 (Minn. App.1997) (summary of school district's interactions with student and student's parent was not "data on individuals" as applied to psychologist who prepared the summary because she was not the subject of the data and, to degree that data identified her, it was incidental to factual focus of data), *review denied* (Minn. Jun. 11, 1997). The district court erred by concluding that Hooper's May 28 letter violated the MGDPA.

**C. Assistant Superintendent Hooper's April 29 statements to Pioneer Press reporter Monsour.**

■ The district court concluded that ten of Hooper's statements to Monsour violated the MGDPA, reasoning that the statements concerned complaints against Navarre and went beyond simply describing the existence and status of the complaints. But the court erred in concluding that four of the statements were "government data" disclosed in violation of the act.

■ To constitute "government data," data must be recorded in some physical form. *Deli v. Hasselmo*, 542 N.W.2d 649, 653–54 (Minn.App.1996), *review denied* (Minn. Apr. 16, 1996). Unrecorded mental impressions of government employees are not "government data." *Keezer v. Spickard*, 493 N.W.2d 614, 617–18 (Minn. App.1992), *review denied* (Minn. Feb. 12, 1993). While the majority of Hooper's

statements are either recorded in or derived from Bess's April 18 letter to Navarre and Hooper's May 28 letter to parents, the following statements were not recorded in physical form or derived from recorded information and are not government data: (1) "[Navarre] had not had other problems that I know of, nothing where anything formal had been filed"; (2) "it's unusual in terms of number of parents calling [D]r. [B]ess and myself"; (3) "[Bess] was not seeing that in other classrooms. Kids move from room to room. Were not having difficulty in other rooms"; and (4) "district had been working with the teacher * * * helping her learn better classroom management." The district court erred by submitting those statements to the jury as violations of the MGDPA.

**D. Superintendent Hoke's May 30 press release stating that "[t]he allegations are serious enough and substantiated enough that we took the action of suspending the teacher and testing the students" and that the school district's concerns had shifted from "concern[s] about student performance to concern[s] about the teacher's teaching methods."**

 The district court correctly concluded that the quoted language from the May 30 press release violated the MGDPA. The information released was private personnel data within the meaning of the MGDPA, went beyond merely identifying the existence and status of a complaint against a public employee, and was disclosed before final disposition of a disciplinary action. *See* Minn.Stat. § 13.43, subd. 2(a)(4); *Unke,* 510 N.W.2d at 273 (statements made before final disposition of disciplinary action identifying specific nature of complaint made against school counselor and alleging that two students

had corroborated allegations made against counselor and that counselor had violated school district's sexual-harassment policy constituted private data and disclosure violated MGDPA); *see also* Op. Minnesota Dep't Admin. No. 01–037 (Apr. 6, 2001) (concluding that school district violated MGDPA by releasing letter to parents stating that complaint against school district employee had been "substantiated" before final disposition of disciplinary action had occurred).

**E. Superintendent Hoke's statements to TV Channel 11: "The allegations I've heard were that kids weren't learning. [Which means she wasn't teaching?] Correct." "[The principal] would visit with the teacher, he would observe the teacher and then eventually he started into the classroom to teach for himself. So as he got more and more evidence he was also concerned. By us admitting there was something wrong by suspending the teacher * * *."**

 Hoke's initial statement concerning the substance of the allegations he had heard, his statement that the allegations suggested Navarre was not teaching, and his statement that by suspending Navarre the district had admitted that something was wrong, derive from either Bess's April 18 letter or Hoke's May 30 press release and, accordingly, constitute government data. Because the statements go beyond the existence and status of the complaints against Navarre and were released before final disposition of a disciplinary action, their release violated the MGDPA. *See* Minn.Stat. § 13.43, subd. 2(a)(4). But Hoke's statement about visits to Navarre's classroom and the resulting increased concerns was not physically re-

corded or derived from a physically recorded document. As such, that portion of the statement does not constitute government data and its release did not violate the MGDPA. Accordingly, that portion of the statement should not have been submitted to the jury as a violation of the MGDPA.

### F. Human Resources Manager Palin's letter to Theresa Monsour stating that the "school district had received complaints from parents and students alleging concerns about Ms. Navarre's classroom management and instructional methods."

 The district court correctly concluded that the statement quoted above, contained in Palin's July 3 letter to Monsour, violated the MGDPA. The statement concerned more than the existence and status of the complaints against Navarre and was released before final disposition of a disciplinary action. *See Id.*

 The school district argues that any release of private personnel data was justified to promote health and safety and to dispel widespread rumor. *See Id.* § 13.39, subd. 2 (allowing agencies to disclose confidential data if the agency determines that access to the data "will aid the law enforcement process, promote public health or safety or dispel widespread rumor or unrest"). We disagree. For section 13.39 to transcend the substantial privacy protection accorded to personnel data, the "transcendence must be clearly justified." *Deli,* 542 N.W.2d at 655, (holding that need to dispel rumors about university coach accused of releasing to students videotape of her and her husband

having sexual relations did not excuse release of private personnel data). Rumors are "part of everyday life." *Id.* at 656. Section 13.39 contemplates only "rumors that threaten the community repose." *Id.* There is no evidence that the rumors about problems in Navarre's classroom threatened the community repose.

Because the jury based its damage award on erroneous instructions concerning the school district's liability, the school district is entitled to a new trial. The district court abused its discretion in denying the school district's motion for a new trial.

### II

The school district next argues it is entitled to JNOV because Navarre failed to prove that she sustained damage or that any damage she sustained was caused by the school district's release of private personnel data. Alternatively, the school district argues that the jury's damage award is excessive, is prohibited by Minn.Stat. § 466.04, subd. 1(1) (1996)[2], and warrants a new trial or remittitur. The school district also argues that the district court abused its discretion by prohibiting the school district from presenting evidence of Navarre's medical history of emotional distress and evidence of Navarre's performance and reputation before the MGDPA violations occurred.

A person who suffers damage as a result of a MGDPA violation may bring an action against a state agency or responsible authority to cover "*any* damages sustained, plus costs and reasonable attorney fees." Minn.Stat. § 13.08, subd. 1 (emphasis added). To prevail on her claim for damages,

---

**2.** Minn.Stat. § 466.04, subd. 1(1) (1996), contained a cap of $200,000 for a municipality's liability for any claim within the scope of the statute. We agree with Navarre that this limi-

tation on a municipality's tort liability does not apply to this action for a statutory violation.

Navarre must show that she sustained damage and that the damage she sustained was a direct result of the school district's alleged violations of the MGDPA. The school district challenges the jury's award of $250,000 for emotional distress and $200,000 for loss of reputation.

## A. Emotional–Distress Damages Award

The school district argues that the jury's award of damages for emotional distress is not supported by competent evidence of genuine injury and must, therefore, be reversed. Alternatively, the school district argues it is entitled to a new trial on damages because the district court abused its discretion by not allowing the school district to conduct an independent medical examination or to impeach Navarre's evidence of emotional harm with her medical records.

Navarre testified that the media attention generated by the school district's disclosures was "devastating" to her career and to her personal life. She stated she had been "sad, depressed, lonely, and isolated" after the publication of the Pioneer Press article. She stated that compared to the previous summer, the summer of 1997 had been "a big black cloud" and that she had been unable to enjoy things she had enjoyed in previous summers. Navarre's father testified that his daughter had "always had great years until about the winter of [1997]." He indicated that the initial impact of the Pioneer Press article on his daughter was "shock." He also stated he had never seen his daughter as upset as she appeared to be during 1997, that she stayed with her parents at their invitation because of their concern

for her, and that on one occasion his daughter had come into her parents' bedroom in the middle of the morning crying.

The school district asserts that Navarre did not show the level of emotional distress necessary to support a damage award. The school district's argument is predicated, in part, on the assumption that the degree of proof necessary to support a damage claim is the same as the degree of proof necessary to maintain an independent cause of action for infliction of emotional distress. But this court has previously ruled that the level of proof necessary to recover damages for violation of a statutory right is different from that required to establish a separate tort claim for infliction of emotional distress. *Bradley v. Hubbard Broadcasting, Inc.*, 471 N.W.2d 670, 677 (Minn.App.1991), *review denied* (Minn. Aug. 2, 1991).[3]

In cases involving violation of a statutory right, emotional-distress damages are recoverable absent evidence of verifiable physical injury or severe emotional distress. *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1272 (8th Cir.1981). An award of emotional-distress damages, nonetheless, must be supported by "competent evidence of 'genuine injury.'" *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir.1999) (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 1052 n. 20, 55 L.Ed.2d 252, (1978)). Although medical testimony or specific proof of out-of-pocket losses are unnecessary, *Williams*, 660 F.2d at 1272, a plaintiff must offer evidence of the nature and extent of emotional harm caused by an alleged violation. *Bailey v. Runyon*, 220 F.3d 879, 880–81 (8th Cir.2000). Conclusory statements that plaintiff suffered emo-

---

**3.** That *Bradley* arose under the Minnesota Human Rights Act, which expressly authorizes "damages for mental anguish or suffering," is not significant because the MGDPA autho-
rizes "*any* damages." *Cf.* Minn.Stat. §§ 363.071, subd. 2 (2000), 13.08, subd. 1 (emphasis added). The term "any damages" certainly includes mental-anguish damage.

tional distress are inadequate because they "give the finder of fact no adequate basis from which to gauge the 'nature and circumstances of the wrong and its effect on the plaintiff.'" *Id.* (quotation omitted). While a person's pain and suffering does not have to be severe for that person to recover damages, *Gillson v. State Dep't of Natural Resources,* 492 N.W.2d 835, 842 (Minn.App.1992), *review denied* (Minn. Jan. 28, 1993), mere "hurt feelings, anger and frustration are part of life [and are] not the types of harm that could support a mental anguish award." *Brady v. Fort Bend County,* 145 F.3d 691, 718 (5th Cir. 1998), *cert. denied,* 525 U.S. 1105, 119 S.Ct. 873, 142 L.Ed.2d 774 (1999), (quotation omitted). Damages may be awarded solely on the basis of a plaintiff's subjective testimony. *Gillson,* 492 N.W.2d at 842.

■ We conclude that Navarre introduced sufficient evidence to justify submission of her emotional-damage claim to the jury. The school district has cited cases that bring into question whether the quantity and quality of Navarre's evidence on this issue supports the amount of the jury award. But we decline to reach the issue of remittitur because we conclude that the school district is entitled to a new trial due to the district court's abuse of discretion in not allowing the school district to impeach Navarre's evidence of emotional harm with her medical records. Navarre's medical records show that she had been treated for anxiety and mild depression and "had not had enjoyment in her usual activities" prior to any of the school district's disclosures of private personnel data. Navarre's pre-existing emotional problems are relevant to whether Navarre's symptoms during the summer of 1997 were caused by the school district's release of information. While it was within the district court's discretion to deny an independent medical examination, we note that the denial of the

independent examination was based, in part, on Navarre's assertion that her existing medical records adequately documented her emotional condition. Exclusion of evidence of Navarre's pre-existing emotional problems substantially prejudiced the school district and warrants a new trial.

**B. Loss-of-Reputation Damages Award**

■ The school district argues that the district court abused its discretion by submitting Navarre's damage claim for loss of reputation to the jury or, alternatively, by not allowing the school district to present evidence of Navarre's reputation prior to the MGDPA violations. We agree that the district court abused its discretion by allowing Navarre to submit her loss-of-reputation claim, supported only by hearsay, and also abused its discretion by prohibiting the school district from presenting evidence of Navarre's reputation prior to the MGDPA violations.

The court allowed Navarre to present evidence that before the disclosures she had performed well as a teacher and was well regarded. Navarre described 13 activities she had participated in since joining the district to assist students and the school district. Navarre testified that after the Pioneer Press article and television coverage she heard from "family members, relatives, teachers from the district" and that over 50 people indicated to her that they were aware of the articles and television coverage. Navarre did not testify to the content of the contacts, but implied that the calls reflected a loss of Navarre's reputation. Navarre's father was allowed to respond to the question: "Is it in fact true that virtually everybody that [Navarre] knew mentioned the article?" He answered: "Yes." He also testified that he advised Navarre never to go back to ele-

mentary education because her "job availability or attractiveness as a candidate would effectively have been destroyed anywhere in the Midwest." This testimony appears to be the only testimony in the record offered to support Navarre's claim of loss of reputation.

The perception of loss of reputation is not evidence of loss of reputation, and we conclude that the district court abused its discretion by denying the school district's motion to dismiss Navarre's claim for damages based on loss of reputation. *See Kohn v. City of Minneapolis Fire Dep't*, 583 N.W.2d 7, 15 (Minn.App.1998) (reversing award for loss of reputation because plaintiff's testimony that he knew some coworkers were aware he was not promoted and "maybe thought less of [him] as a firefighter as a result" was too speculative to support finding of damage to reputation), *review denied* (Minn. Oct. 20, 1998).

Even if the evidence outlined had been sufficient to permit the claim to be submitted to the jury, the district court abused its discretion by precluding the school district from impeaching Navarre's testimony with evidence concerning Navarre's performance and reputation prior to the disclosures.

Navarre's prior reputation, which includes her performance as a teacher, is the benchmark from which the jury should have valued her alleged loss of reputation. Without evidence of Navarre's reputation as it stood before the school district's disclosures, any damage award for loss of reputation is speculative. *Id.; Gillespie v. Klun*, 406 N.W.2d 547, 558 (Minn.App. 1987) (upholding damage award for reputation loss based on testimony that prior to defendant's actions, plaintiff ran a successful business, had never been sued, and enjoyed a good reputation), *review denied* (Minn. July 9, 1987).

The district court's evidentiary ruling resulted in the jury hearing only Navarre's evidence about her prior reputation and substantially prejudiced the school district. *See Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 300 (Iowa Ct.App.1985) (stating that in libel cases jury must be presented with "evidence upon which the consequences of the libel can be judged, evidence such as the nature of the plaintiff's reputation before the libel was published * * *.").

### III

The school district next argues that the jury's award for lost wages and loss of earning capacity must be reversed because Navarre was not discharged and suffered no wage loss attributable to MGDPA violations. Navarre admits she was not actually discharged, but claims she was constructively discharged because the extensive publicity surrounding the school district's release of information made it impossible for her to return to a position with the school district.

At trial, the school district argued that a claim of constructive discharge was not available to Navarre because she did not plead this claim and because, as a tenured teacher subject to a collective-bargaining agreement, her sole remedy for alleged violations of her employment terms was through the grievance process, which she failed to pursue to conclusion. The school district also argues that matters related to a teacher's employment, including suspensions, termination, and any other employment issues, are properly reviewed only by a writ of certiorari and that the district court erred by submitting these issues to the jury. *See Dokmo v. Independent Sch. Dist. No. 11*, 459 N.W.2d 671, 673, 678 (Minn.1990).

The district court denied the school district's motions and instructed the jury that

[e]ven though Katharine Navarre voluntarily resigned from her position, her resignation may constitute a constructive discharge if she resigned to escape intolerable working conditions caused by the illegal conduct of the employer.

Because Navarre does not seek to recover lost wages under her employment contract but rather under a separate statutory cause of action for violation of the MGDPA, we conclude that her claim for lost wages is not barred by her failure to pursue arbitration to exhaust her administrative remedies or by her failure to proceed by writ of certiorari. *Cf. Schuyler v. Metropolitan Transit Comm'n,* 374 N.W.2d 453, 455 (Minn.App.1985).

We hold, nonetheless, that the district court erred as a matter of law by submitting Navarre's wage-loss claim to the jury. Constructive discharge is a companion tort frequently used in the context of discrimination claims arising under the Minnesota Human Rights Act. *See, e.g., Huyen v. Driscoll,* 479 N.W.2d 76, 81 (Minn.App.1991), *review denied* (Minn. Feb. 10, 1992). An employer constructively discharges an employee only if, with the intention of forcing the employee to resign or with knowledge that resignation was a reasonably foreseeable consequence of its actions, the employer creates an objectively intolerable work environment that forces the employee to resign. *Pribil v. Archdiocese of St. Paul & Minneapolis,* 533 N.W.2d 410, 412 (Minn.App.1995); *Huyen,* 479 N.W.2d at 81. Whether employment conditions are in fact intolerable is a question of fact judged by a reasonable-person standard. *Pribil,* 533 N.W.2d at 412. The employee bears the burden of proving constructive discharge. *Jurgens v. Equal Employment Opportunity Comm'n,* 903 F.2d 386, 390 (5th Cir.1990).

Navarre did not plead constructive discharge. Minn. R. Civ. P. 8.01 requires that pleadings contain a concise claim showing that the pleader is entitled to relief. A claim is sufficiently stated if it gives [the adverse party] fair notice of the theory on which the claim for relief is based. *Barton v. Moore,* 558 N.W.2d 746, 749 (Minn.1997). Notice of the claim and the grounds upon which it rests must be pleaded with enough particularity to permit application of the res judicata doctrine. *Royal Realty Co. v. Levin,* 244 Minn. 288, 292, 69 N.W.2d 667, 670 (1955). Claims may be pleaded by allegations of evidentiary fact, broader conclusions of fact, or conclusions of law. *First Nat'l Bank v. Olson,* 246 Minn. 28, 37–38, 74 N.W.2d 123, 129 (1955). Navarre's complaint contains no evidentiary facts, broader conclusions of fact, or conclusions of law sufficient to notify the school district of her constructive-discharge claim and its basis.

Even if Navarre had properly pleaded constructive discharge, the school district's violations of the MGDPA are inadequate, as a matter of law, to establish constructive discharge. The record contains no evidence that the school district acted intentionally to force Navarre to resign or that it acted with knowledge that its actions would create intolerable working conditions that would force Navarre to resign. In fact, the evidence establishes the opposite. The evidence shows that the school district offered Navarre a teaching position for the 1997–98 academic year at a school where Navarre would be working with a principal who had worked successfully with Navarre in the past and was willing to ease Navarre's return to work.

The evidence is also insufficient to support a finding that Navarre's working conditions were intolerable. *Cf. Thompson v. Campbell,* 845 F.Supp. 665, 673–74 (D.Minn.1994) (holding that work environment not intolerable even though men

talked about female anatomy at work and made sexual advances toward female employees). Although Navarre experienced the embarrassment that resulted from criticism of her performance as a teacher, criticism alone is insufficient, as a matter of law, to establish intolerable working conditions. *Huyen,* 479 N.W.2d at 81. The district court erred in denying the school district's JNOV motion with respect to Navarre's lost-wages and loss-of-earning-capacity damage claim.

## IV

Because we have already concluded that the school district is entitled to a new trial, we do not address the school district's claims of attorney misconduct and jury misconduct. Many of the offensive remarks and the alleged punitive attitude of the jury came about because of evidentiary rulings that we have addressed and are unlikely to reoccur on retrial.

Likewise, we need not address in detail the school district's claim that it is entitled to a new trial based on the district court's failure to exclude statements and articles that did not violate the MGDPA and failure to instruct the jury that several claims against the school district and other named defendants had been dismissed.

▬▬▬ Evidentiary rulings are normally left to the sound discretion of the district court. *Verhel v. Independent Sch. Dist. No. 709,* 359 N.W.2d 579, 591 (Minn. 1984). In this case, the district court expressed some concern that the school district might be held accountable for non-actionable events, but, after first agreeing to give the school district's requested instruction on dismissed claims, it ultimately declined to give such an instruction or to exclude articles, letters, and statements that did not violate the MGDPA. Because the court properly instructed the jury on causation, the school district was not prej-

udiced by the court's discretionary decision not to instruct the jury on dismissed claims. *See e.g., Fortney v. Al Hajj,* 188 W.Va. 588, 425 S.E.2d 264, 269 (1992). On retrial, careful consideration must be given once again to instructing the jury on causation so that any award is based solely on damage that Navarre establishes was directly caused by the release of information in violation of the MGDPA, rather than on non-actionable release of information by the district or the press.

## V

Because we are reversing and remanding, we do not consider the school district's claim that the district court abused its discretion in denying its motion regarding attorney fees and costs.

## DECISION

The district court erred as a matter of law in determining the number and substance of the school district's MGDPA violations. The district court abused its discretion by prohibiting the school district from presenting evidence of Navarre's pre-existing mental condition and prior reputation, by submitting Navarre's loss-of-reputation claim to the jury, and by submitting Navarre's wage-loss claim to the jury. The school district is entitled to a new trial.

**Reversed and remanded.**